## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ESTATE OF CHARLES SILSBY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Case No. CIV-23-103-GLJ |
| | ) |
| JARROD ROBERTS, DAVID BUSS, | ) |
| and NEILL BALTHIS, | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

This case arose during Charles Silsby's incarceration at Jess Dunn Correctional Center in Taft, Oklahoma. Mr. Silsby ("Silsby"), who died at the end of the events in this case, is represented by his Estate. Plaintiff alleges violations of the Eighth Amendment, pursuant to 42 U.S.C. § 1983, as to individual Defendants Jarrod Roberts, David Buss, and Neill Balthis.[1] The individual Defendants have now each filed motions for summary judgment. For the reasons set forth below, the Court finds that Defendants' Motion for Summary Judgment and Brief in Support [Docket No. 42] is hereby GRANTED.

### I. Procedural History

Plaintiff filed the present case in this Court on March 20, 2023. *See* Docket Nos. 1-2. Plaintiff alleges each of the individual Defendants improperly denied Silsby medical treatment while acting within the course and scope of their employment with the

---

[1] Warden Casey Hamilton was previously dismissed from this case on June 16, 2023. *See* Docket No. 25.

Department of Corrections and Jess Dunn Correctional Center and were therefore deliberately indifferent to his serious medical needs.  *See* Docket No. 2, p. 6, ¶¶ 33-34.

On April 13, 2023, Defendants and Hamilton filed a Motion to Dismiss for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted. Docket No. 18.  The motion was granted as to Warden Casey Hamilton in his official capacity, but denied as to the individual Defendants, leaving Plaintiff's § 1983 claim of an Eight Amendment violation as to Defendants Roberts, Buss, and Balthis.  *See* Docket No. 25, p. 14.  Defendants Roberts, Buss, and Balthis moved for summary judgment on September 19, 2024.  The motion is now fully briefed, and the Court has stayed all attendant deadlines in this case pending resolution of the Motion for Summary Judgment. Docket No. 46.  As an initial matter, Plaintiff concedes summary judgment in favor of Defendant Buss.  *See* Docket No. 49, pp. 21-22.  Accordingly, Defendants' Motion is granted as to Defendant Buss and he is entitled to qualified immunity.

## II. Law Applicable

Summary judgment is appropriate if the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The moving party must show the absence of a genuine issue of material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), with the evidence taken in the light most favorable to the non-moving party, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  However, "a party asserting that

a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute[.]" Fed. R. Civ. P. 56(c).

### III. Factual Background

The relevant undisputed facts reflect that Silsby was an inmate housed at Jess Dunn Correctional Center ("JDCC") in Taft, Oklahoma. On March 11, 2021, he underwent a colonoscopy offsite, and returned to JDCC the same day. Docket No. 42, pp. 6-7, ¶¶ 1-3. That evening around midnight, Silsby went to the office of the unit manager, Sgt. Moore, complaining of abdominal pain due to the colonoscopy. *Id.*, p. 7, ¶ 10; Docket No. 49, p. 8, ¶ 10. The unit manager conveyed these complaints to Defendant Balthis, Lieutenant and shift supervisor, who called the on-duty nurse[2] to inform her of the complaints. Sgt. Moore's Incident Report, Docket No. 49, Ex. 4, indicates the nurse said she would see Silsby in the morning if his pain got worse. Silsby returned to the Sgt. Moore's office a couple hours later, around 2:10 a.m. on March 12, 2021, reporting that he could not urinate, was dry heaving, and could barely breathe and move. *Id.* Sgt. Moore then took Silsby to Balthis's office so that Balthis could observe his condition, at which time Balthis called "medical" again and the answering person said they would see him in the morning. *Id.*; Docket No. 42, p. 8, ¶ 16. There is no corresponding report from Balthis or from the on-duty nurse for either the midnight or the 2:00 a.m. interactions. Balthis testified in his deposition that he had been unaware that Silsby had undergone a colonoscopy on March

---

[2] The medical clinic is not staffed from 5:00 p.m. to 5:00 a.m., but there is an on-duty nurse who can be reached for sick calls. Docket No. 42, p. 7, ¶ 5.

11, but Plaintiff notes that Silsby informed Sgt. Moore of the procedure and he conveyed some portion of Silsby's status and information to Balthis. *See* Docket No. 42, Ex. 1, p. 4; Ex. 3, p. 19, ln. 12-p. 22, ln. 10.

At 12:07 p.m. on March 12, 2021, LPN Leslie Oliver electronically signed a "Post-Hospitalization/ER/Procedure Assessment." Docket No. 42, Ex. 1, p. 4; Docket No. 49, Ex. 5, p. 20. It recorded Silsby's vitals (dated March 12, 2021 at 12:05 p.m.) and included notations that Silsby was within normal limits, as well as a Progress Note stating, "Inmate to medical for post hospital. Instructed inmate to resume diet and to drink plenty of fluids. Instructed that he needs to be walking to release some of the gas that's in him. Instructed that if he's not feeling better in 2 days to place a sick call." *Id.*; *see also* Docket No. 42, p. 9, ¶¶ 23-26; Docket No. 49, p. 10, ¶¶ 23-26. After this day, Silsby made no written sick calls or requests to be seen. Docket No. 42, p. 9, ¶ 28; Docket No. 49, p. 10, ¶ 28. Plaintiff alleges, however, that Silsby and fellow inmate Dennis Boone made a number of attempts to get medical treatment for Silsby that were all ignored until March 18, 2021. Docket No. 49, p. 10, ¶ 28 & Exs. 3-5. On March 16, 2021, Certified Physician Assistant Heather Hasenmyer electronically signed a "Diagnostic/Laboratory/X-ray Results – Offender Notification" form, which contained the following comments: "Your Upper Scope (EGD) showed inflammation of your stomach and upper portion of the small intestine. I have ordered you Prilosec (omeprazole). Limit the amount of Ibuprofen, Aleve (NSAIDs) that you take. The Lower Scope (colonoscopy) showed non-cancerous polyps. They want to repeat this in 3 months, your intestines were not fully cleaned out of stool." Docket No. 42, Ex. 1, p. 3. While acknowledging this record exists, Plaintiff contends there is no

-4-

indication Silsby was present for this "Offender Notification."  Docket No. 49, p. 10, ¶ 29.

On March 18, 2021, the unit manager escorted Silsby to the medical clinic for abdominal pain.  Upon examination, the nurse found he should be transported to the hospital.  Before jail transport arrived, Silsby fell to the ground, prompting security to contact EMS, who took Silsby to Saint Francis Hospital in Muskogee, Oklahoma.  While there, Silsby had internal bleeding and an unsteady pulse, so he was transported to Saint Francis Hospital in Tulsa, Oklahoma.  After being checked in at Saint Francis in Tulsa, Silsby was then placed on life support in the ICU at 10:40 a.m.  At 3:40 p.m., JDCC was notified that Silsby had passed away.  Docket No. 42, p. 10, ¶¶ 30-33.

Defendant Roberts was the Health Services Administrator for JDCC on March 18, 2021.  Roberts because aware of Silsby on March 18, when he was notified that Silsby, in critical condition, was being transported from Saint Francis in Muskogee to Saint Francis in Tulsa.  Roberts did not coordinate medical transfers, but he was notified when they happened.  Upon notification of Silsby's transfer to Tulsa, Roberts notified Silsby's emergency contacts of his critical condition and of the process for requesting a visit.  Roberts was not personally familiar with Silsby and was unaware of any complaints.  Docket No. 42, pp. 10-11, ¶¶ 34-42.

### Analysis

Defendant Balthis contends that Plaintiff cannot maintain an Eighth Amendment claim against him because Plaintiff cannot show he was deliberately indifferent to Silsby's serious medical needs.  Defendant Roberts makes the same contention, and further alleges that Plaintiff cannot show personal participation in any constitutional violation.    Both

Defendants contend they are therefore entitled to qualified immunity. For the reasons set forth below, the Court finds that Defendants Balthis and Roberts are entitled to qualified immunity.

### A. Defendant Neill Balthis.

The Court first turns to whether Defendant Balthis is entitled to qualified immunity. *See Cunningham v. New Mexico*, 2014 WL 12791236, at *4 (D. N.M. May 12, 2014) ("Additional steps are taken when a summary judgment motion raises a defense of qualified immunity.") (citing *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009)). "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

"'When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right *and* (2) the constitutional right was clearly established. The court may consider either of these prongs before the other 'in light of the circumstances in the particular case at hand.'" *Cunningham*, 2014 WL 12791236, at *4 (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (emphasis added)). "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. 825, 844 (1994). "In other words, immunity protects 'all but the plainly incompetent or those

who knowingly violate the law.'" *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).  "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment— showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law."  *Rojas v. Anderson*, 727 F.3d 1000, 1003 (10th Cir. 2013) (internal quotation marks omitted).

Violation of a Constitutional Right.  Plaintiff's allegation of failure to provide medical care "must be judged against the 'deliberate indifference to serious medical needs' test of *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)."  *Frohmader v. Wayne*, 958 F.2d 1024, 1028 (10th Cir. 1992) (quoting *Martin v. Board of County Commissioners of County of Pueblo*, 909 F.2d 402, 406 (10th Cir. 1990)).  Under the Eighth Amendment, "prison officials must ensure that inmates receive adequate food, clothing, shelter, and **medical care**, and must 'take reasonable measures to guaranty the safety of the inmates.'"  *Farmer*, 511 U.S. at 832 (emphasis added) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-527 (1984)).  "Failure to provide adequate medical care is a violation of the Eighth Amendment if it is a result of deliberate indifference to a prisoner's serious medical needs."  *Garcia v. Salt Lake County*, 768 F.2d 303, 307 (10th Cir. 1985) (citing *Estelle*, 429 U.S. 97).

> Deliberate indifference involves both an objective and a subjective component.  The former is met if the deprivation is sufficiently serious – that is, if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.  The latter is satisfied if an officer knows of and disregards an excessive risk to a detainee's health or safety.  Essentially, the officer must be aware of facts from which the inference could

be drawn that a substantial risk of serious harm exists, and he must also draw
the inference.

*Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002) (internal citations and

quotations omitted).  *See also Martinez*, 563 F.3d at 1088 ("The test for deliberate

indifference is both objective and subjective.") (citing *Callahan v. Poppell*, 471 F.3d 1155,

1159 (10th Cir. 2006)).  "Our cases recognize two types of conduct constituting deliberate

indifference.  First, a medical professional may fail to treat a serious medical condition

properly. . . .  The second type of deliberate indifference occurs when prison officials

prevent an inmate from receiving treatment or deny him access to medical personnel

capable of evaluating the need for treatment."  *Sealock v. Colorado*, 218 F.3d 1205, 1211

(10th Cir. 2000).  Here, the latter type of deliberate indifference is at issue.

    The Tenth Circuit has explained that the objective component is based on the harm

claimed by the Plaintiff, and "whether the harm suffered rises to a level 'sufficiently

serious' to be cognizable under the Cruel and Unusual Punishment Clause.'"  *Mata v. Saiz*,

427 F.3d 745, 753 (10th Cir. 2005) (quoting *Farmer*, 511 U.S. at 834).  "Once the prisoner

selects the harm, however, the focus of the objective prong should be solely on whether

that harm is sufficiently serious."  *Mata*, 427 F.3d at 753.  In this case, Plaintiff claims the

harm is death by complications of ischemic bowel with perforation, which the Court finds

is of sufficient seriousness to satisfy this objective component.  *See, e. g.*, *Martinez*, 563

F.3d at 1089 ("We agree with Martinez and the district court that the ultimate harm to Mr.

Ginn, that is, his heart attack and death, was, without doubt, sufficiently serious to meet

the objective component necessary to implicate the Fourteenth Amendment.") (quotation

omitted).

"The subjective component is akin to 'recklessness in the criminal law,' where, to act recklessly, a 'person must 'consciously disregard' a substantial risk of serious harm.' And '[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence.' The fact that a serious medical need was 'obvious' could be evidence of deliberate indifference, although a 'prison official may show that the obvious escaped him' and avoid liability." *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (quoting *Farmer*, 511 U.S. at 837, 839, 842, & 843 n. 8). As such, "the Tenth Circuit has recognized that conduct constituting deliberate indifference may arise in the form of 'a prison official preventing an inmate from receiving medical treatment or denying access to medical personnel capable of evaluating the inmate's condition.'" *Welsh v. Bishop*, 2015 WL 1064155, at *4 (D. Colo. March 9, 2015) (quoting *Self*, 439 F.3d at 1231, 1232 ("A claim is therefore actionable only in cases where the need for additional treatment or referral to a medical specialist is obvious.")).

In other words, "'the prisoner must show that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it.'" *Martinez*, 563 F.3d at 1089 (quoting *Callahan*, 471 F.3d at 1159). "Defendants will not be entitled to qualified immunity if the symptoms displayed by Plaintiff were obvious enough to warrant a finding that Defendants knew of the risk of a serious medical condition but disregarded that risk." *Marquez v. Board of County Commissioners Eddy County*, 2012 WL 12895017, at *5 (D. N.M. Dec. 3, 2012). Accordingly, "[a] prisoner

may satisfy the subjective component by showing that defendants' delay in providing medical treatment caused either unnecessary pain or a worsening of his condition. Even a brief delay may be unconstitutional." *Mata*, 427 F.3d at 755 (collecting cases); *Winrow v. Stell*, 2015 WL 3645702, at *7 (W.D. Okla. March 5, 2015 ("Denying or delaying a prisoner's access to medical professionals capable of assessing or treating the prisoner's condition can establish the subjective component, particularly when unnecessary pain or a worsened condition results."). However, "[m]ere negligence by prison officials or medical staff will not suffice to meet the subjective prong of deliberate indifference." *Casanova v. Ulibarri*, 2011 WL 13157058, at *6 (D.N.M. Sept. 1, 2011) (internal citations omitted). As such, "[t]he question is: 'were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?'" *Martinez*, 563 F.3d at 1089 (quoting *Mata*, 427 F.3d at 753); *see also Whiteman v. El Paso Criminal Justice Ctr.*, 2011 WL 2610202, at *4 (D. Colo. July 1, 2011) ("[A] general awareness of the potential for harm is not enough; there must be a connection between the subjective disregard of a risk of serious harm and the objective harm actually claimed.") (citing *Martinez*, 563 F.3d at 1089 n.8).

The crux of the disagreement between the parties is whether Balthis knew Silsby needed outside medical care prior to the time an ambulance was called on March 18, 2021, nearly seven days after his return from the colonoscopy and six days after any documented interaction between them. *See Farmer*, 511 U.S. at 842-844 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. . . .[I]t remains open to the officials to prove that they were unaware even of an obvious

risk to inmate health or safety.  That a trier of fact may infer knowledge from the obvious, in other words, does not mean that it must do so.").  Balthis contends he only saw Silsby in the early hours of March 12, before Silsby was taken to medical later that morning, and at no time thereafter.  Balthis testified at his deposition that, to his recollection, Sgt. Moore called him around midnight on March 11, 2021 going into March 12, to say that Silsby was complaining of abdominal pain, and that she told him that medical would seem him in the morning if it continued.  Docket No. 42, Ex. 3, p. 19, ln.16-23.  Balthis related this to Sgt. Moore, who relayed that to Silsby.  Around 2:00 a.m., Sgt. Moore called again to say that Silsby could not use the bathroom and was vomiting.  Balthis called the nurse again, and she said they would see Silsby in the morning.  Balthis states that Sgt. Moore took Silsby to medical around 4:30 a.m., and that he did not see Silsby after the 12th.  *Id.*, pp. 19 ln. 24 - p. 20, ln. 10 & p. 22, ln. 8-10.  Balthis testified that he was not aware at the time that Silsby had undergone a colonoscopy, but that such knowledge would not have changed his actions and he still would have called the medical duty nurse.  *Id.*, pp. 20, ln. 12 – p. 21, ln. 11; p. 39, ln. 15-20.

Plaintiff admits Silsby was evaluated by medical on March 12, 2021, after his March 12 encounter with Balthis, and received a "post-hospital procedure assessment," which noted his vital signs and readings as within normal limits, and reflected advice from the nurse.  Docket No. 42, p. 9, ¶¶ 23-26.  Docket No. 49, p. 10, ¶¶ 23-26.  Despite this critical admission, Plaintiff also makes the contradictory assertion that Silsby was not taken to medical on March 12 or provided medical treatment that day, and that he was not provided medical care on March 13.  Docket No. 49, pp. 9, ¶ 19 & p. 13, ¶ 10.  Plaintiff bases these

arguments on two things: a lack of "On Call Nurse Telephone Triage Notes" from March 12 or March 13, and an affidavit from fellow inmate Dennis Boone. Although there are no "On Call Nurse Telephone Triage Notes" from March 12 or 13, there *is* a note that Silsby was seen by medical on March 12 after Balthis was notified Silsby needed medical attention, and all indications were that Silsby was within normal limits.

Plaintiff contends that Balthis should have called EMS in the early morning hours of March 12, that he knew Silsby had undergone a colonoscopy, and that he had a bubble in his stomach, was in severe pain, felt like his stomach was on fire, could not pee, was dry heaving, and could barely breathe or move. Balthis testified that his authority to call EMS was "situational," giving an example of an inmate coming in with five or six stab wounds and saying that he would call EMS in that situation. *Id*, p. 24, ln. 1-10. He also described situations where there were mass stabbings at the facility, and he was both activating EMS and calling medical to let them know. *Id.*, ln. 16-24. However, he stated that he did not receive training on what situations required him to call medical first, as opposed to calling EMS, and said that such determination was based on "your call," or "common sense action." *Id.*, p. 25, ln. 4-15. Additionally, Balthis testified that, in light of the chain of command at JDCC, Sgt. Moore would not have been able to call EMS; it was Balthis's responsibility as lieutenant and shift supervisor. *Id.*, pp. 36 ln. 24 – p. 37, ln. 1. As to Silsby's appearance, Balthis testified that, to his recollection, "he was able to come up to my office, which is walking up a hill, upstairs. So he could move, I mean, if we're arguing that. I mean, he's – he was able to move, but I didn't visually see him not able to pee or dry heaving or – he was breathing and he came up to my office, so, yeah." *Id*, p. 37, ln.11-

17. Sgt. Moore's Incident Report states that Moore took Silsby to Balthis's office without commentary on whether he walked or needed assistance. Docket No. 49, Ex. 4. Plaintiff nevertheless contends Balthis was aware of all Silsby's complaints, that he still did not ensure Silsby received any medical care, and that there is no evidence as to how Silsby made it to Balthis's office, implying there is a possibility he arrived in a wheelchair. None of these arguments, however, negate Plaintiff's admission that Silsby received medical care on March 12, *after* the only documented incident between Balthis and Silsby.

Mr. Boone asserts in his affidavit that Silsby fell down and was unconscious two separate times on the first day (March 11) he returned from his colonoscopy, that he asked the unit manager to take Silsby to medical, and that the unit manager told them to wait until morning because it was not an emergency. Docket No. 49, Ex. 3, pp. 1-2, ¶¶ 4-5. Additionally, he says unnamed correctional officers refused to take Silsby to medical on the second day (*i.e.*, March 12), and that the Sgt. Moore refused to get a wheelchair for him on "the next day" (*i.e.*, March 13). *Id.*, p. 3, ¶¶ 6-7. Boone states that he asked Sgt. Moore to call Balthis to "come down and do his own evaluation," which Balthis did with three other officers. *Id.*, ¶ 8. Boone says that Balthis talked to Silsby for about ten minutes, then "told Mr. Silsby that they would take him to medical in the morning" (*i.e.* March 14). During "that night," (March 13 into March 14) Boone states that Silsby passed out and fell to the ground in the middle of the night. Boone, after talking with Sgt. Moore, ultimately carried Silsby to the day room with another inmate's help, at which time the unit manager got the wheelchair and took Silsby to medical. *Id.*, pp. 2-4, ¶¶ 8-11. Boone states, "that was the last time I saw Mr. Silsby." *Id.*, p. 4, ¶ 11. As to Balthis, Boone's affidavit thus

states that Balthis talked to Silsby for about ten minutes sometime around March 13 or 14, then left him on his bunk after that conversation and after informing Silsby that they would take him to medical "in the morning."

Under this vague timeline, Boone appears to be stating that he last saw Silsby on the morning of March 14 or 15.  Plaintiff admits, however, that Silsby was not taken to medical until March 18, 2021, which was the day he was transported to the hospital and ultimately passed away.  Plaintiff further admits that Silsby made no written request to be seen by medical between March 12 and March 18, but contends that Silsby and Boone made a number of verbal requests.  Docket No. 42, p. 9, ¶ 28; Docket No. 49, p. 10, ¶ 28. Plaintiff also admits that the record contains the March 16, 2021, "Diagnostic/Laboratory/X-ray Results - Offender Notification," but asserts, as noted above, that there is no indication Silsby was present or taken to medical for this notification. Docket No. 42, p. 8, ¶ 29 & Ex. 1, p. 3; Docket No. 49, p. 10, ¶ 29.

The Court notes that the risk claimed by the Plaintiff (here, death by complications of ischemic bowel with perforation) must be the same risk ignored by Balthis.  *See Bruner-McMahon v. Jameson*, 566 Fed. Appx. 628, 633 (10th Cir. 2014) ("The risk prison officials ignored must be the risk appellants claimed.") (citing *Martinez*, 563 F.3d at 1089) ("Finally, the subjective component requires the prison official to disregard the risk of harm claimed by the prisoner.").  Although the need for a medical evaluation *may* have been obvious, Plaintiff has pointed to no evidence that Balthis was aware of the risk of death by complications of ischemic bowel with perforation.  *Estate of Moffitt by and through Kramer v. Minor*, 2017 WL 6349706, at *14 (D. Colo. Sept. 28, 2017) ("Although Hosier

may have ultimately been wrong in his assessment that Moffitt needed mental health treatment as compared to treatment for his alcohol related symptoms, a mistake or even negligent failure to provide adequate medical care does not rise to the level of a constitutional violation."); *see also Bruner-McMahon*, 566 Fed. Appx. at 634 (noting that "appellants were required to produce evidence showing that defendants appreciated that [the inmate] 'had a risk of a fatal medical condition and chose to disregard' *that* risk.") (emphasis in original) (quoting lower court record).  As in *Bruner-McMahan*, this Court finds that the Plaintiff has not shown any evidence that Balthis "recognized that [Silsby] was at risk of a fatal medical condition and consciously disregarded it." *Id.*  This is true whether Balthis was aware that Silsby had undergone a colonoscopy or not – a point on which the parties disagree.  Indeed, there is no evidence Balthis even disregarded a risk because he did contact medical and agreed Silsby should be taken to medical on the morning of March 12.  Furthermore, Silsby was not taken to the hospital until six days later and there is no evidence Balthis encountered Silsby or made medical decisions regarding Silsby in that time period.

Mr. Boone's affidavit to the contrary does not affect this conclusion.  "At the summary judgment stage, evidence need not be submitted 'in a form that would be admissible at trial.' Parties may, for example, submit affidavits in support of summary judgment, despite the fact that affidavits are often inadmissible at trial as hearsay, on the theory that the evidence may ultimately be presented at trial in an admissible form." *Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (quoting *Celotex*, 477 U.S. at 324).  "[H]owever, the content or the substance of the

evidence must be admissible." *Bryant v. Farmers Ins. Exchange*, 432 F.3d 1114, 1122 (10th Cir. 2005). Here, the content of Boone's affidavit does not clearly refute Balthis's testimony by any sort of understandable timeline. There is no evidence that Silsby made a request for medical after March 12 or that Balthis refused to allow it, *i.e.*, there is no evidence to refute either Balthis's testimony that he only spoke to Silsby on March 12 or the documentary evidence that Silsby received medical treatment after his encounter with Balthis on March 12. Plaintiff has failed to provide evidentiary support for a constitutional violation.

<u>Clearly Established Constitutional Right</u>. Next, the Court addresses whether Plaintiff can point to a clearly established constitutional right. "Ordinarily, a plaintiff may show that a particular right was clearly established at the time of the challenged conduct 'by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, 'the clearly established weight of authority from other courts must have found the law to be as [he] maintains.'" *A.M. v. Holmes*, 830 F.3d 1123, 1135 (10th Cir. 2016) (quoting *Quinn v. Young*, 780 F.3d 998, 1005 (10th Cir. 2015)). However, "'clearly established law' should not be defined 'at a high level of generality.'" *White*, 580 U.S. at 79 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Instead, it "must be 'particularized' to the facts of the case. Otherwise, '[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 639-640 (1987)). In this Circuit, "[t]he right to custodial medical care is clearly established." *Olsen*, 312 F.3d at 1315 (citing *Estelle*, 429 U.S. at 106). Here, it is the issue

of medical care while he was at the Jail. Plaintiff simply reiterates that the right to custodial medical care is clearly established, while Balthis contends that Plaintiff's argument is raised at too high a level of generality.

It was clearly established well before Silsby's death in 2021 that "deliberate indifference to an inmate's serious medical need [violates] a clearly established constitutional right." *Estate of Booker v. Gomez*, 745 F.3d 405, 433 (10th Cir. 2014) (quoting *Mata*, 427 F.3d at 749); *see also Olsen*, 312 F.3d at 1315 ("The right to custodial medical care is clearly established."); *Quintana v. Santa Fe Cty. Bd. of Comm'rs*, 973 F.3d 1022, 1033 (10th Cir. 2020) ("[P]rior to January 2016, it was clearly established that when a detainee has obvious and serious medical needs, ignoring those needs necessarily violates the detainee's constitutional rights."); *Mata*, 427 F.3d at 749 ("[T]here is little doubt that deliberate indifference to an inmate's serious medical need is a clearly established constitutional right[.]"). "Where prior cases establish the 'obviousness' of a medical need, conscious disregard of that need alone may suffice." *Quintana v. Santa Fe Cnty. Bd. of Commissioners*, 973 F.3d 1022, 1032 (10th Cir. 2020). The question is therefore whether Balthis, by (i) calling the on-call nurse twice but not calling EMS, (ii) sending Silsby to medical the morning of March 12, and (iii) having no documented interaction thereafter, consciously disregarded Silsby's medical needs. Based on the undisputed facts, he did not.

As stated above, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. Here, Balthis

reasonably responded to the risk in front of him and he is therefore entitled to qualified immunity.

### B.    Defendant Jarrod Roberts.

Roberts was the Health Services Administrator for JDCC on March 18, 2021. Plaintiff admits that Roberts did not authorize medical transports, but was notified of them afterward, and that he never met Silsby or was aware of any medical complaint by him. Roberts's role in this case was limited to notifying Silsby's emergency contacts on March 18, 2021, when he was in critical condition. Plaintiff nevertheless alleges that although Roberts's job duties included making sure inmates get the medical care they need, he was not aware of training and did not participate in discussions regarding medical care of inmates after hours. "Section 1983 does not authorize liability under a theory of respondeat superior." *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011) (*citing Monell v. Dep't of Social Services*, 436 U.S. 658, 691 (1978)). "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). The Tenth Circuit has interpreted this to mean that "§ 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy" causing the constitutional harm. *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010). This takes the form of either personal liability through personal involvement, *or* supervisory liability based on a violation of a policy. *Brown*, 662 F.3d at 1164-1165 ("Personal liability under § 1983 must be based on . . . personal

involvement, and supervisory liability must be based on his Policy."); *see also Dodds*, 614 F.3d at 1199-1200 (noting "*Iqbal*'s requirement that § 1983 liability only be imposed upon those defendants whose own individual actions cause a constitutional deprivation because it requires plaintiffs prove each defendant took some act with the constitutionally applicable state of mind that caused the alleged constitutional violation.") (citation omitted).  "Therefore it is particularly important in such circumstances that the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) (emphasis in original).

To establish personal involvement for supervisory liability it is insufficient "merely to show [that the supervisor] was in charge of other state actors who actually committed the violation."[3]  *Dodds*, 614 F.3d at 1195 (quotation omitted).  What *is* required is that the "plaintiff must plead that *each* Government-official defendant, through the official's own individual actions, has violated the Constitution." *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 768 (10th Cir. 2013) (emphasis added) (quoting *Iqbal*, 556 U.S. at 676).  As to causation, the Plaintiff is required "to show that the defendant's alleged action(s) caused the constitutional violation" by "set[ting] in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of h[is] constitutional rights." *Schneider*, 717 F.3d at 768 (quotation omitted).  As

---

[3] And here, it is not even clear that a violation of Silsby's constitutional rights occurred.

-19-

to the third element, "[p]recisely what state of mind is required for individual liability depends on the type of claim a plaintiff brings," *Schneider*, 717 F.3d at 769, but "'can be no less than the *mens rea* required' of the subordinates to commit the underlying constitutional violation." *Estate of Booker*, 745 F.3d 435 (quoting *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010)). "In sum . . . plaintiffs here must establish that each defendant – whether by direct participation or by virtue of a policy of which he possesses supervisory responsibility – caused a violation of plaintiffs' clearly established constitutional rights, and that each defendant acted with the constitutionally requisite state of mind." *Pahls v. Thomas*, 718 F.3d 1210, 1228 (10th Cir. 2013) (emphasis added); *see also Brown*, 662 F.3d at 1164-1165 ("Personal liability under § 1983 must be based on [Defendant's] personal involvement, and supervisory liability must be based on his Policy.").

Roberts asserts that there was no underlying constitutional violation and that he did not personally participate in any denial of medical care for Silsby because he never interacted with or met Silsby. Furthermore, Roberts testified that he did not supervise or work with jail staff. Docket No. 49, p. 67, ln. 12-25. Roberts only learned of Silsby when Silsby was transferred from the hospital in Muskogee to the one in Tulsa. Additionally, there are no written requests for medical attention between the time of Silsby's colonoscopy and his transfer to the Muskogee hospital.

Plaintiff admits there is no evidence of direct personal participation by Roberts as to Silsby or his care at JDCC. In fact, Plaintiff admits that Roberts was not aware of Silsby until after he left JDCC and was being transferred to the hospital in Tulsa, Oklahoma. As

such, the Court turns to whether, by virtue of a policy of which Roberts possessed supervisory responsibility, he caused a violation of Plaintiff's clearly established constitutional rights, and that he acted with the constitutionally requisite state of mind. *See Pahls*, 718 F.3d at 1228.

Plaintiff contends that Roberts's jobs duties included notifying correctional officers that Silsby had undergone a colonoscopy, and that it is a question of material fact as to whether Balthis had been made aware of that fact. Plaintiff additionally contends that, to ensure inmates received proper medical care, Roberts should have had discussions with corrections staff regarding after-hours medical care, when to contact staff or the on-duty nurse, and when to call 911 for immediate medical attention.

Under *Dodds*, the question becomes whether Roberts "[1] promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." 614 F.3d at 1199-2000. As the Health Services Administrator, it is not clear the Roberts is ultimately responsible for the policies at JDCC, but the remaining two factors are even less clear, *i.e.*, whether he caused the complained-of constitutional harm and whether he did so with the requisite state of mind. *See Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008) ("The official's knowledge of the risk need not be knowledge of a substantial risk to a *particular* inmate, or knowledge of the particular manner in which injury might occur."); *see also Layton v. Bd. of Cty. Comm'rs of Oklahoma Cty.*, 512 Fed. Appx. 861, 870 (10th Cir. 2013) ("Appellants merely needed to present evidence that Mr. Holdstock faced a substantial risk

of serious harm of which the prison officials were, or should have been, aware.") (citing *Gonzales v. Martinez,* 403 F.3d 1179, 1183 (10th Cir.2005) ("[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm *actually* would befall an inmate; it is enough that the official acted or failed to act *despite his knowledge* of a substantial risk of harm.") (quoting *Farmer,* 511 U.S. at 842) (internal quotation marks omitted)). Whatever the policies at the jail and who was responsible for them, the Court cannot find evidence of awareness of the risk of harm rising to the level of deliberate indifference as to Roberts. *See Gonzales*, 403 F.3d at 1183 ("'Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including *inference* from circumstantial evidence.'") (quoting *Farmer*, 511 U.S. at 842). At most, Plaintiff asserts Roberts *should have created* different policies with regard to after-hours medical care and as to decisions between contacting medical and/or contacting EMS. Plaintiff asserts no facts that Roberts possessed the requisite state of mind of negligence, much less deliberate indifference, to survive summary judgment. Roberts is thus entitled to qualified immunity.

In sum, Defendants Balthis, Roberts, and Buss are entitled to qualified immunity.

## CONCLUSION

Accordingly, the Court finds that Defendants' Motion for Summary Judgment and Brief in Support [Docket No. 42] is hereby GRANTED.

IT IS SO ORDERED this 2nd day of January, 2025.

**GERALD L. JACKSON**
**UNITED STATES MAGISTRATE JUDGE**

-22-